John van Loben Sels/Bar No. 201354
jvanlobensels@thoits.com
Brittany M. Nobles/Bar No. 343513
bnobles@thoits.com
**THOITS LAW**
A Professional Corporation
400 Main Street, Suite 205
Los Altos, California 94022
Telephone:  (650) 327-4200
Facsimile:  (650) 325-5572

*Attorneys for Plaintiff,*
ANTHONY NOBLES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY NOBLES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>THEVAULTMS.COM, LLC, a Mississippi Limited Liability Company; SONICBIDDER.COM, a Delaware Limited Liability Company; JERRY D. PASS, an individual, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **CONVERSION**<br>2. **BREACH OF CONTRACT**<br>3. **BREACH OF FIDUCIARY DUTY**<br>4. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**<br>5. **INTENTIONAL MISREPRESENATION**<br>6. **NEGLIGENT MISREPRESENTATION**<br>7. **CONSTRUCTIVE FRAUD**<br>8. **UNJUST ENRICHMENT**<br>9. **VIOLATION OF BUS. PROF. CODE § 17200** *et seq.*<br>10. **DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED [FRCP 38]** |

Plaintiff Anthony Nobles ("Plaintiff") hereby files this Complaint against TheVaultMS.com, LLC, SonicBidder.com, LLC, and Jerry D. Pass (collectively, "Defendants") and alleges as follows.

# I. THE NATURE OF THE ACTION

1. Plaintiff's action seeks to recover damages for conversion, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, constructive fraud; for injunctive relief under CAL. BUS. & PROF. CODE § 17200 *et seq.*; and further equitable relief for unjust enrichment, money had and received, and an accounting.

2. Plaintiff hereby seeks: (1) all general and special damages arising from Defendants' misconduct as alleged below, including but not limited to actual damages and consequential damages; (2) injunctive relief enjoining Defendants' unlawful conduct as alleged herein, including but not limited to their unfair and unlawful business practices and their publication of false and misleading, fraudulent information published and advertised on both TheVaultMS.com, LLC's and Sonicbidder.com, LLC's websites, which, on information and belief are controlled by Defendant Pass; (3) injunctive relief ordering Defendants to return to Plaintiff all personal property belonging to Plaintiff that remains in Defendants' possession, custody, or control; (4) pre-judgment and post-judgment interest; (5) restitution of all monies and personal property belonging to Plaintiff, which Defendants have unlawfully retained for themselves and by which they have unjustly enriched themselves; (6) an accounting of all documents and records concerning Plaintiff's personal property that is the subject of this Complaint; (7) an accounting of all monies received by Defendants or any of them for the sale and use of Plaintiff's personal property; (8) an accounting of all personal property belonging to Plaintiff, that Plaintiff entrusted to Defendants as alleged herein; (9) exemplary and punitive damages in an amount to be determined at trial; (10) attorneys' fees as allowed by law for Defendants' tortious conduct; (11) attorneys' fees as a result of Defendant's intentional, fraudulent, malicious, oppressive conduct; and (12) all such other relief that this Court finds just and proper.

## II.   THE PARTIES

3.     Plaintiff is and, at all times relevant hereto was, a legal resident of the U.S. Virgin Islands. Outside of the days he resides in the U.S. Virgin Islands, Plaintiff conducts most of his business in the County of Orange, California. Plaintiff is a successful surgical engineer who has developed numerous medical devices and procedures over the course of his career spanning over three decades.

4.     Plaintiff grew up extremely poor, overcame homelessness, and through decades of dedication and entrepreneurship in his chosen fields, has enjoyed great success. Plaintiff has enjoyed using his success to provide opportunities that were not available to him to underprivileged youth and their families in the Orange County area, and essential resources to communities in Orange County by supporting first responders, and youth and education programs, including scholarships and school supplies for deserving youth.

5.     Plaintiff has also enjoyed the hobby of collecting rare and vintage cars. Plaintiff's car collection, which he maintains at his private museum in Orange County, California, comprises a wide variety of vehicles from rare Ferraris and race cars to sentimental classics. In addition to his passion, Plaintiff's cars reflect substantial investments. Plaintiff has developed his collection over many years and, in 2021, sought to curate a somewhat final, personal collection. It was through these efforts that Plaintiff ultimately came into contact with Defendants.

6.     Defendant TheVaultMS.com, LLC is a Mississippi Limited Liability Company having a principal place of business located at 390 Commerce Park Dr., Jackson, MS 39213. TheVaultMS.com, LLC ("The Vault") describes itself as "the Souths [sic] premier classic car dealer."[1] On information and belief, The Vault and/or Defendant Jerry Pass own(s) and/or operates the internet-based

---

[1] *See* https://thevaultms.com/contactus/. Last Accessed October 31, 2022.

THOITS LAW
A PROFESIONAL CORPORATION

auction website Sonicbidder.com to facilitate the sale and auction of vehicles that The Vault either acquires, or sells on behalf of their owners. The Vault's website specifically advertises its services, which include consignment and listing services.[2] The Vault's website further advertises, "Let us help you market your vehicle to the world," and "Let the Vault list your specialty vehicle with its many online platforms for one small fee." *Id.* In sum, The Vault specifically advertises to consumers globally, targeting individuals from out-of-state, such as Plaintiff, to engage The Vault's purported services. The Vault's website identifies that its cars for sale are located in a variety of states across the United States of America.

7.    Defendant SonicBidder.com, LLC ("Sonic Bidder") is a Delaware Limited Liability Company registered with the Missouri Secretary of State and having a principal place of business located at 390 Commerce Park Dr., Jackson, MS 39213. On information and belief, SonicBidder.com, LLC is owned and/or operated by The Vault and/or Defendant Jerry Pass ("Pass"). Sonic Bidder purports that its website sonicbidder.com is "a custom build online auction platform designed to enhance[sic] the auction buying experience." In addition, Sonic Bidder advertises that its reach and services are global: "Sonicbidder.com's global auctions bring thousands of bidders and millions of dollars in buying power to your event, internationally. Your sell will reach an audience at home and all over the world!"[3] In sum, Sonic Bidder specifically advertises to consumers globally, targeting individuals from out-of-state, such as Plaintiff, to engage Sonic Bidder's purported services.

8.    On information and belief, Defendant Jerry Pass is an individual residing in Brandon, Mississippi. At all times material hereto, Pass was identified on The Vault's business filings with the Missouri Secretary of State as an officer

---

[2] See https://thevaultms.com/vehicle-consignment/. Last Accessed October 31, 2022.

[3] See https://sonicbidder.com/about-us/. Last Accessed October 31, 2022.

4

COMPLAINT

THOITS LAW
A PROFESSIONAL CORPORATION

of The Vault, having the title of Manager of the Limited Liability Company. On information and belief, at all times material hereto, Pass was an owner or managing member of Sonic Bidder.

9.     Plaintiff is unaware of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend the complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and, based upon such information and belief, alleges that each of the fictitiously named Defendants are legally responsible in some manner for the occurrences herein alleged, and that Plaintiff's losses as herein alleged were proximately caused by such wrongful acts and omissions.

10.     At all times material hereto, Defendants and each of them acted for and on behalf of each other to perpetrate the conduct described below for their unlawful purposes.

## III.    JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Plaintiff is a resident of the U.S. Virgin Islands; The Vault is organized under the laws of the State of Mississippi where it has its principal place of business; Sonic Bidder is organized under the laws of the State of Delaware; Pass resides in the State of Mississippi; and the amount in controversy exceeds the sum of seven hundred thousand dollars ($700,000.00). Therefore, this Court has diversity jurisdiction over the claims pled herein.

12.     This Court has personal jurisdiction over Defendants because at all times material hereto, each of Defendants regularly and consistently conducted business in the State of California and availed themselves of the laws of the State of California.

## IV.    VENUE

13.     Venue is proper in this district under 28 U.S.C. § 1391, because the

THOITS LAW

A PROFESSIONAL CORPORATION

harms giving rise to the claims pled herein occurred within this judicial district, a substantial part of the property that is the subject of this action is situated in this judicial district, Defendants conducted business within this judicial district, and to the extent this complaint alleges facts and claims arising out of a written contract, that contract was negotiated and formed in this judicial district, and a substantial part its performance took place in this judicial district. Plaintiff never visited Defendants' businesses in the states where they are domiciled.

14.     Alternatively, venue is proper under 28 U.S.C. § 1391 in this District, because Defendants are subject to the court's personal jurisdiction in this District.

## V.     FACTUAL BACKGROUND

### A. Plaintiff First Learned of Defendants Through Their Website

15.     In or about the spring of 2021, Plaintiff sought the best and most cost effective manner in which to curate his car collection and make the most of his investments by selling them for the greatest return or trading them for a few vehicles he sought to include in his complete and permanent collection. As an avid collector of very specific and meaningful cars, Plaintiff regularly conducted online research regarding the availability of those cars. This is how Plaintiff first came across The Vault's website.

16.     In particular, through his research Plaintiff identified that The Vault was advertising a rare 1957 Ford Thunderbird F-Code (the "T-Bird") for sale. Plaintiff had been looking for such a T-Bird and found that Defendants were selling one. Plaintiff called The Vault to seek a trade of one or more of Plaintiff's cars for the T-Bird. It was at that time Plaintiff first engaged with Defendant Pass. Once Plaintiff raised his interest in a trade, Pass inquired as to what Plaintiff had to trade for the T-Bird. Once Plaintiff responded that he had a substantial and significant car collection, Pass' demeanor changed and he began to solicit Defendants' services to Plaintiff. Specifically, Pass raved about his

THOITS LAW

A PROFESSIONAL CORPORATION

large showroom of cars and his experience in the car auction and sale industry. During that phone call, Pass represented that he had sold rare cars of the caliber Plaintiff had begun to describe were in his collection, and Pass further represented he had sold whole collections as well.

17.   On The Vault's website, Pass held himself out as an experienced auctioneer, applying skills from cattle and livestock auctions to car auctions. In particular, Pass held himself out to assert the following:

> Here [At The Vault] we do the same thing. We push very hard everyday to provide customer service and consumer confidence which in turn produces results and record sales. In a world that's now moving steadily to an online world where most of our clients are global. We are at the tip of the spear.[4]

It was statements like this and the experience Pass held out that his company The Vault possessed that made Plaintiff feel Defendants would be the right parties to represent him in his plan to sell his investments for the greatest return possible.

18.   In part due to Defendants' advertisements, Plaintiff came to believe that if he engaged Defendants to represent his interests in selling his vehicles, that the relationship would be professional and run smoothly given the experience Defendants held out they had in the industry; and further, that although of course there were no guarantees in terms of amounts Plaintiff would be able to receive for his investments that, at minimum, Defendants would act in his best interest to secure the greatest return for Plaintiff's investments.

19.   Furthermore, in part due to Defendant's advertisements, and the numerous sales Defendants' held out to have made, Plaintiff came to believe that The Vault and Sonic Bidder were legitimate businesses, and that Pass was an experienced and successful, legitimate businessperson.

**B. Plaintiff's Initial Communications With Pass, Who Acted For And On Behalf Of All Defendants**

---

[4] https://thevaulttms.com/jd-pass-story/. Last accessed April 8, 2023.

THOITS LAW
A PROFESSIONAL CORPORATION

20.     After their initial phone call, Plaintiff and Pass stayed in touch via email and phone regarding the potential sale of Plaintiff's cars. After a few email exchanges taking place over the course of a few weeks during which Pass assured Plaintiff that he had extensive experience selling numerous cars at the caliber of Plaintiff's cars, that he had sold entire collections, and had clients abroad who would be at any auctions he held that offered Plaintiff's cars for sale, Pass arranged with Plaintiff a meeting by which Pass could come to Plaintiff's private museum in Orange County and view Plaintiff's cars.

21.     On or about June 3, 2021, Pass communicated with Plaintiff by phone, and the two swapped stories about cars and discussed their passion for the same. On June 3, 2021, Pass sent Plaintiff a text message stating in part, "It was a pleasure visiting with you look forward to swapping more stories and helping you sell a few of your cars and trading a few cars…"

22.     On June 4, 2021, Plaintiff responded he was also looking forward to selling and trading his cars, to which Pass responded, "Send me the list and pricing." Plaintiff immediately created a spreadsheet of the following vehicles, describing them and identifying a minimum price per car that reflected the fair market value for each of them at the time. Some of these prices were later updated ahead of their sale:

     a. 1931 Auburn 8-98A, award winning car with history from original owner (maroon): asking of $125,000;

     b. 1956 VOLPINI Formula Jr. race car (1 of 3) (red): asking $125,000;

     c. 1960 SCARAB Formula 1, ex-Lance Reventlow car (1 of 3) (blue): asking $1,000,000;

     d. 1961 LOTUS 20B Formula 1, New Zealand Grand Prix race car (green): asking $185,000;

     e. 1961 LOTUS 20/22 Formula Jr. race car (green): asking $120,000;

     f. 1961 LOTUS 20/22 Formula Jr. race car (green): asking $120,000;

THOITS LAW
A PROFESSIONAL CORPORATION

g. 1962 LOTUS 22 Formula Jr. race car (green): asking $135,000;

h. 1967 Sunbeam Tiger MK1a 302 race car (white): asking $50,000 initially, and then listed at $60,000 ahead of the actual sale;

i. 1975 Bricklin SV1 (white): asking $15,000, then later listed at $30,000 ahead of sale;

j. 1975 Rolls Royce Silver Shadow limousine (ex-In-N-Out Burger family limousine) (white): asking $38,000, then later listed at $45,000 ahead of the sale;

k. 1982 Ferrari Mondial 8 (blue): asking $35,000;

l. 1983 RAM March (ex-Jacque Villeneuve Sr. car) (white): asking $450,000;

m. 1985 Rolls Royce Limousine (white): asking $44,000;

n. 1990 Bently Mulsanne S (white): asking $18,000;

o. 1996 Lola (red): asking $65,000;

p. 1996 Rolls Royce Silver Spur (white): asking $7,500;

q. 1997 Ferrari 456 GTA (silver): asking $52,000;

r. 2002 Ferrari 360 Spyder; asking $75,000;

s. 2003 Lola F3000, 2 seater (ex-Marc Gene, Le Mans winning driver and Ferrari F1 driver car)(red): asking $185,000;

t. 2008 Ford/IVECO Ferrari/Schumacher team motorhome (red): asking $350,000 (collectively, the "Cars").

23.     On June 16, 2021, Pass sent Plaintiff a message asking if they were "still on for June 30 and July 1" so Pass could view Plaintiff's Cars in person.

**C. Pass Visited Plaintiff's Private Museum And Induced Plaintiff To Execute The Sales Agreement**

24.     On or about June 30-July 1, 2021, Pass visited Plaintiff's private museum and took numerous photos of Plaintiff's cars.

25.     During that visit, Plaintiff made Pass aware that one of his primary

THOITS LAW
A PROFESSIONAL CORPORATION

goals with selling these investments was to obtain the greatest return, as he sought to pare down his collection and free up cash, not just to pursue rounding out his final collection, but specifically because he had been doing construction on his retirement home and sought to use the proceeds from his cars to pay for those renovations.

26.    In response, Pass asserted that he could guarantee sales of Plaintiff's cars for at least the minimums Plaintiff had identified to him. Because of these representations, and additional representations that he had substantial experience selling the specific cars Plaintiff sought to sell, Pass further induced Plaintiff to decide to consider providing Defendants more cars to sell on his behalf.

27.    During Pass' visit, he viewed more of Plaintiff's rare cars, including Plaintiff's racecars and his 1964 275 Ferrari GTB and his 1981 BMW M1. In connection with that visit, and alongside Pass' representations to Plaintiff, Pass presented Plaintiff with a Sales Agreement between The Vault and Plaintiff, by which Defendants would represent Plaintiff in the sale of Plaintiff's cars. The terms of the Sales Agreement included terms for how the sales of Plaintiff's cars would take place, namely that The Vault would advertise Plaintiff's cars for sale and receive offers on behalf of Plaintiff to purchase his cars; thereafter, according to the terms of the Sales Agreement, The Vault was bound to notify Plaintiff of offers it had received and deemed, in good faith, to be the best and most reasonably acceptable offer for the Property that met or exceeded the minimum gross sales price for that specific car as agreed upon by Plaintiff and The Vault as set for in the Exhibit A to the Sales Agreement.

28.    The Sales Agreement by its terms created an agency relationship between Plaintiff and Defendants whereby Defendants were to act for and on behalf of Plaintiff in good faith in selling his cars.

29.    The terms of the Sales Agreement further included commission and payment terms: The Vault was to receive a 4% commission on sales of Plaintiff's

THOITS LAW
A PROFESSIONAL CORPORATION

cars calculated from the "Gross Sales Price," or the sales price paid by the buyer less any buyer premium and taxes or fees; and, The Vault was to pay Plaintiff for all sales within thirty (30) business days of having received the collection of sales proceeds from a buyer.

30.     In addition, the Sales Agreement required Plaintiff to pay a "Title Processing Fee" of $125 for any vehicle sold that had a title, and to furnish to The Vault certain photos of the vehicles to be sold.

31.     With regard to each and every one of the cars offered for sale under the Sales Agreement, Plaintiff performed all of his obligations under the Sales Agreement. In addition to the explicit terms of the Sales Agreement, the conduct of the Parties created an agency relationship by which Defendants were to act for and on behalf of Plaintiff in good faith in selling his cars for the greatest return.

32.     In addition to the foregoing vehicles, after the execution of the Sales Agreement, Plaintiff and Defendant communicated fairly regularly for a time. Through those communications, Plaintiff raised his intention to sell several other of his higher end cars, identifying is 1964 Ferrari 275 GTB having a VIN ending in 06575 (the "Ferrari 275"). Shortly after Plaintiff raised his intention to sell the Ferrari 275, Pass asserted that Plaintiff should send several of his higher end cars to Defendants' facilities. At first, this did not make sense to Plaintiff, because it would be wasteful to send cars to Missouri for which there not yet any buyers. Shortly thereafter, Pass informed Plaintiff that he should send the titles to his Ferrari 275, his BMW M1, his Formula 1 car, and the 2-seater Marc Gene race car, along with the cars themselves, to Missouri because Defendant had buyers for each of these cars lined up. Pass then asserted that he would pay for transportation to Missouri, and transportation back to Plaintiff if the cars for some reason did not sell, which gave Plaintiff confidence in Pass and Defendants' ability to sell these specific cars.

33.     The Ferrari 275, which had a fair market value of over $2,000,000 at

THOITS LAW
A PROFESIONAL CORPORATION

the time, the BMW M1, which had a fair market value of over $550,000 at the time, Plaintiff's two Formula 1 cars the Scarab worth roughly $1,200,000, the March Ram worth over half a million dollars, and his 2-seater Marc Gene race car worth $130,000, were all subsequently transported to Defendants' premises in Missouri with Plaintiff believing that Defendants had buyers ready to purchase each and every one of these cars.

34.     Thereafter, Plaintiff provided additional vehicles to sell under the Sales Agreement, including the following: a second 1975 Bricklin SV1, 1982 a Porsche 928-S, a 1953 Puma, and a 2005 Mazda Formula race car.

35.     After Pass' visit to Plaintiff's museum, Pass represented that he would take care of Plaintiff's vehicles and arranged for shipping of several of Plaintiff's cars to Defendants' facilities in Missouri, where Defendants housed numerous cars in their showroom.

36.     For a short time, it appeared that Defendants would sell Plaintiff's cars under the Sales Agreement according to its terms. In addition, Defendants represented to Plaintiff that they were planning a large and high end auction that would attract buyers worldwide to view Plaintiff's remaining cars. Defendants initially sold two of Plaintiff's cars quickly before any of Plaintiff's cars were sold at an auction, which also gave Plaintiff confidence that they intended to sell his cars in good faith on Plaintiff's behalf.

37.     However, when it came time for payment, Defendants casually asserted they would pay Plaintiff for those two cars after the auction took place, when he could pay Plaintiff all at once. Plaintiff was initially disinclined to wait for payment beyond the thirty (30) days required by the Sales Agreement, but Pass spoke with Plaintiff directly to assure him that Plaintiff's money was safe, and that the upcoming auction would yield a great return for Plaintiff.

38.     Ultimately, and as detailed herein, Defendants perpetrated a bait and switch confidence scheme against Plaintiff to take advantage of his physical

distance from Defendants and the incredibly busy work travel schedule they knew Plaintiff had to keep for work.

**D. Defendants Breached The Sales Agreement And Their Fiduciary Duties To Plaintiff By Failing to Pay Him for Reported Sales**

39.     After a short time, Defendants' conduct began to give Plaintiff pause. In total, Defendants reported to Plaintiff that they sold Plaintiff's 1931 Auburn 8-98A, 1967 Sunbeam Tiger MK1a 302 race car, the two 1975 Bricklin SV1s, 1975 Rolls Royce Silver Shadow limousine, 1981 BMW M1, 1982 Ferrari Mondial, 1982 Porsche 928-S, 1985 Rolls Royce Limousine (purchased by The Vault), 1996 Lola, 1996 Rolls Royce Silver Spur, and 2002 Ferrari 360 Spyder.

40.     Most of these sales were under the asking price (including those Defendants purchased from Plaintiff and now are selling for higher prices on their websites). Under the Sales Agreement, The Vault was obligated to pay Plaintiff the gross sales price less the 4% commission and fees within thirty (30) days of receiving payment from the buyer of each car respectively. By November 1, 2021, Defendants initially owed Plaintiff a total of over $700,000, exclusive of any proceeds from the illegal sale of Plaintiff's 1997 Ferrari 456 on or about December 18, 2021, as detailed further herein. Although Defendants made some payments, which were late in themselves and made only after efforts by Plaintiff to obtain those payments, Defendants stopped any after December 18, 2021.

41.     Further, Defendants informed Plaintiff they had purchased his 1990 Bentley Mulsanne S (asking price of $18,000) and his 1962 Lotus 20/22 Formula Jr. race car (for $120,000). However, Defendants never paid Plaintiff for either.

42.     By October 13, 2021, Pass sent Plaintiff a sales report showing he had about $481,000 in gross sales from the sale of Plaintiff's vehicles (allegedly including the two purchased by The Vault). About this time, Pass specifically asserted that he was working on selling some of Plaintiff's highest value cars, the BMW M1 and the 1964 Ferrari 275. Pass noted the potential buyer wanted the

THOITS LAW
A PROFESIONAL CORPORATION

BMW M1 at a price of $400,000 but that Pass believed he could get the potential buyer to accept a higher price. Pass also represented to Plaintiff that he had a potential buyer for the Ferrari 275 at a price between $2,100,000 and $2,200,000.

43.     Ultimately, Pass convinced Plaintiff to take less than his original asking price for Plaintiff's rare and desirable BMW M1 by representing he had a buyer who would purchase Plaintiff's Ferrari 275 GTB for $2,200,000, about $200,000 higher in price than Plaintiff's minimum asking price, offsetting the difference between Plaintiff's asking price for the BMW M1 and what the buyer he had lined up to purchase the BMW M1 was willing to pay.

44.     In fact, Pass explicitly told Plaintiff that the buyer he had for the Ferrari 275 had "committed to buy" the Ferrari 275 for $2,200,000 contingent on the car being as represented by Plaintiff upon inspection by the buyer, and that with regard to the lower price Pass wanted Plaintiff to take for his BMW M1, that Plaintiff would "make it up on the 275," referring to the $200,000 over Plaintiff's minimum price for the Ferrari 275. The condition of the Ferrari 275 was as represented by Plaintiff, so there should have been no issue with the sale.

45.     In response to Pass' assertions, Plaintiff pointed out that in a Bring a Trailer auction that took place only weeks prior, a nearly identical BMW M1 was sold for about $565,000 after a bidding war Plaintiff requested that Defendants first contact the bidder who lost the bidding war to sell the vehicle at a price near what that buyer was willing to pay in the lost auction.

46.     Although Pass acknowledged Plaintiff's request in writing and stated "will do" with regard to the same, Plaintiff heard nothing further from Pass on the matter. On information and belief, Pass failed to contact Bring a Trailer or the bidder who lost the BMW M1 auction. Instead, Pass informed Plaintiff the best deal he could get at the time was $400,000, again asserting the $200,000 difference would readily be made up through the sale of the Ferrari 275.

47.     However, it eventually became clear that there was no buyer for the

THOITS LAW
A PROFESIONAL CORPORATION

Ferrari 275. Instead, Pass strung Plaintiff along, asserting that the buyer was ready to complete final inspections and was otherwise ready to purchase Plaintiff's Ferrari 275 for $2,200,000.

48.     This fake buyer was not the only fake interest in the Ferrari 275 that Defendants created. Pass also asserted there was a buyer who had a small twin engine plane like the one Pass himself was looking into purchasing. Pass asserted that buyer wanted to put together a partial trade deal by which he would give Plaintiff both the plane and cash for the car. Plaintiff was not in the market for a plane, and Pass asserted that if Plaintiff opted for that deal that Pass would take possession of the plane instead of Plaintiff and pay Plaintiff for the difference between the cash provided by this potential buyer and the purchase price.

49.     At about this time, Defendants owed Plaintiff substantial outstanding amounts in connection with his prior sale of Plaintiff's cars. Defendants stalled making payments to Plaintiff for those amounts, asserting that their bank accounts had been frozen by law enforcement because of a fraud investigation into an individual who had at some point engaged in a sale transaction for some cars with Defendants. Defendants assured Plaintiff that the matter was being handled to rectify the issue with Defendants' accounts and that Pass needed only thirty (30) days to get funds released to complete the deal for the plane. However, Plaintiff rejected this proposal by Pass.

50.     Relying on Defendants' apparently false representations regarding the existence of a multiple potential buyers for the Ferrari 275, including one who was willing to pay $2,200,000 for the car directly, and only under these specific conditions, Plaintiff agreed to sell his BMW M1 for $400,000. However, almost immediately after Plaintiff agreed to these terms, Defendants informed Plaintiff that the buyer for the Ferrari 275 had mysteriously fallen through. Pass also intentionally stopped responding regularly to Plaintiff and, ultimately, failed to proffer a real offer to Plaintiff for the sale of the Ferrari 275.

THOITS LAW
A PROFESSIONAL CORPORATION

51.     On information and belief, Pass convinced Plaintiff to sell the BMW M1 at the lesser price of knowing full well Pass had achieved no deal for Plaintiff on the Ferrari 275 that would yield the difference, and never having a reasonable basis upon which to believe that deal was ever going to be consummated. As a direct and proximate result of Pass' intentional misrepresentations to Plaintiff regarding the amounts Plaintiff would receive for the sale of these two vehicles, Plaintiff received $200,000 less than the total fair market value of the BMW M1.

52.     In addition, Pass' communications with Plaintiff became more distant, and Pass became hard to reach. Ultimately, Pass intentionally made himself difficult to reach to avoid dealing with Plaintiff or having to pay him what he was owed. For example, Plaintiff's representative reached out to Defendants on several occasions to follow up with Pass on payments. Every time, the person with whom Plaintiff's representative spoke gave an excuse for why Pass could not come to the phone, including in one instance that Pass was not present, although Plaintiff could Pass on another call angrily telling the listener to tell someone they would not receive their money. In sum, it became obvious that Pass was dodging any communication with Plaintiff and his representatives.

53.     On or about November 9, 2021, Pass further stalled paying Plaintiff the money he was owed for the sale of his cars by asserting to Plaintiff that he was "putting out fires" on his end, and that his mother had died. However, Plaintiff felt that something was not right. Plaintiff responded that regardless of "fires," he needed to know what was going on with outstanding payments and Plaintiff's cars that were still in Defendants' possession. At this time, Plaintiff was traveling in Italy for work, navigating his work travel schedule amidst Pass' apparent attempts to dodge communications with Plaintiff.

54.     Pass knew this, and in response to Plaintiff's repeated requests for a call, on or about November 9, 2021, Pass sent Plaintiff some legal notices he had received and some other documents to pacify Plaintiff. None of these documents

resolved Defendants' failure to pay Plaintiff for his cars that had long been sold. Rather than send Plaintiff the status of his payments in writing, on or about November 9, 2021, Pass requested Plaintiff call him instead. Pass regularly failed to provide detailed messages in writing, which Plaintiff has come to believe is part of Defendants' tactics to avoid liability for their unlawful conduct. Instead, they communicated almost exclusively by phone. When Plaintiff did call Pass in response to his request, Pass very obviously pretended his phone was losing reception and cutting out such that it was impossible for the two to have a phone conversation. Thereafter, Pass sent Plaintiff a message to "sit tight" and see what happens, referring to the release of Defendants funds, which Defendants represented were tied up in frozen accounts through no fault of their own.

55.     Eventually, Defendants sent Plaintiff about $128,000 of the substantial sum they still owed Plaintiff for the sale of his cars. On information and belief, Defendants only sent Plaintiff this amount because they were still hoping to get Plaintiff or his friends to invest in Pass' business expansion plans.

56.     On information and belief, Pass abused the distance between Plaintiff and Defendants and the extreme travel schedule that Plaintiff kept to maintain his businesses, as a way to delay payment with the hopes that Plaintiff would give up trying to seek those payments. Amidst Defendants' numerous excuses for non-payment, it had become clear to Plaintiff that Pass had lied about who he was and what he and Defendants were capable of.

57.     Defendants took advantage of Plaintiff, believing that his success meant that Plaintiff's cars and their sales proceeds were of little consequence to him. However, Defendants miscalculated the importance of Plaintiff's investments to him, despite Plaintiff having previously provided Defendants notice of their meaning and the importance of their sale prior to the execution of the Sales Agreement.

**E. The Parties Executed An Amendment To The Sales Agreement**

THOITS LAW
A PROFESIONAL CORPORATION

**And Plaintiff Revoked Authorization To Sell His Cars**

58.     By this time, Plaintiff had lost trust in Defendants' ability and intentions to perform under the Sales Agreement. As a result, the Parties entered into an Amendment to the Sales Agreement (the "Amendment"), effective November 12, 2021. Under the Amendment, The Vault agreed to cooperate with and assist Plaintiff with the transportation of his Cars back to Plaintiff's museum in Orange County, California.

59.     Further, under the Amendment, Plaintiff and The Vault agreed that the following three Cars of those initially identified as "Property" for sale under the Sales Agreement were no longer "Property" under that agreement: Plaintiff's 1960 SCARAB Formula 1, ex-Lance Reventlow car, his 1983 RAM March, and his 2003 Lola F3000. As a result, Defendants had no right to sell or dispose of those Cars. In addition, the Amendment expressly revoked Defendants' right to sell the Ferrari 275. The Amendment also revoked any and all power of attorney previously granted to The Vault under the Sales Agreement as null and void.

60.     The Amendment further explicitly acknowledged the outstanding amounts Defendants owed Plaintiff totaling $672,525.00.

61.     Still having not been paid for the sales of his cars, Plaintiff again raised the issue of payment. Pass responded he would get Plaintiff more of the money owed once more of the funds tied up from the purported account freeze became available. On or about November 30, 2021, Plaintiff requested the return of his 2 seater race car, and Pass agreed to send back the race car to Plaintiff. Shortly thereafter, Defendants sent Plaintiff about $120,000 of the outstanding amounts owed to him. By this time, the communications between Plaintiff and Pass had become even worse in terms of getting a hold of Pass and getting a straight answer from him concerning payments for the sale of Plaintiff's vehicles.

F.  **Defendants Sold Plaintiff's 1997 Ferrari 456 GTA Without Authorization And Dodged Communicating With Plaintiff**

THOITS LAW
A PROFESSIONAL CORPORATION

62.     Despite the explicit terms of the Amendment, on or about December 18, 2021, the date of Defendants' online "Christmas Around the World Auction," Defendants informed Plaintiff they had sold his 1997 Ferrari 456 GTA for a reported $35,000, without Plaintiff's permission or authorization. That is, Defendants knowingly sold Plaintiff's personal property with the intent to dispose of it and dispossess Plaintiff of it permanently although they knew full well that they did not have the right to sell, offer for sale, or take any action on behalf of Plaintiff with regard to the 1997 Ferrari 456 GTA. In fact, Defendants' sale or disposal of Plaintiff's vehicle was a blatant breach of the explicit and material terms of the November Amendment. On information and belief, Defendants' conduct was reckless and exacted with malice and oppression. On or about May 1, 2022, Plaintiff confirmed on The Vault's website that it reported the 1997 Ferrari 456 GTA as sold.

63.     Furthermore, Defendant's entering into the Amendment with Plaintiff was fraudulent. On information and belief, at the time The Vault entered into the Amendment, Pass and Defendants had no intention of ever performing the terms of the Amendment, nor did they have any intention of ever paying Plaintiff what he was owed under the Amendment.

64.     Specifically, Defendants determined to take advantage of Plaintiff's distance and consuming business travel schedule to buy time to sell more of Plaintiff's cars in hopes of turning a profit for themselves, whether because they expected Plaintiff to simply be satisfied with the return of some of his cars, or whether to gain yet another commission as a result of the sale of the 1997 Ferrari 456 GTA, whichever they could achieve depending on Plaintiff's reaction.

65.     In early January 2022, Plaintiff called Pass and sent him messages asserting they needed to follow up and go over various items, namely the outstanding payments, which still amounted to several hundred thousand dollars. By late January and into early February 2022, Pass asserted he had gotten

THOITS LAW
A PROFESSIONAL CORPORATION

COVID-19 as yet another excuse for why he could not simply issue payment of funds that had now been outstanding since the prior year.  By about February 10, 2022, Plaintiff informed Pass they would need to close out the balance of what was owed to Plaintiff, about $275,374.

66.    Still having been unable to have a simple call with Pass, on or about February 14, 2022, Plaintiff asserted through a text message that he needed to talk with Pass that day. Pass responded by asking if they could speak the following day because he was at his doctor's office about to receive chest x-rays.

67.    Still having heard nothing substantive from Pass, on or about February 17, 2022, Plaintiff sent him another message. On or about February 20, 2022, Pass apologized that he was "finishing balance sheets and banking to keep us going." Plaintiff responded they needed to speak that day and asserted his disappointment he had still not been paid.

68.    On or about March 28, 2022, Plaintiff sent Pass a message in view of the refusal of Pass to communicate with him further. Plaintiff communicated that at this point, he assumed that none of Defendants had any plans to respond, and that he hoped he would not have to handle the matter through his legal counsel. Still, Pass failed to respond.

69.    To date, Defendants have not paid Plaintiff a dime for the outstanding amounts or tried to make recompense for their unlawful sale of the 1997 Ferrari 456 GTA. Plaintiff's attempts to communicate with Pass through the same channels he previously and regularly communicated with Pass went purposefully ignored by Pass entirely.

70.    Furthermore, upon information and belief, at the time Defendants executed the Amendment, they had no intention of ever paying Plaintiff the $672,525.00 owed to him. Rather, on information and belief, Defendants agreed to signing the Amendment as an inducement to string him along and arrest Plaintiff's then immediate attempts to recover the substantial sum owed to him.

THOITS LAW
A PROFESSIONAL CORPORATION

In the long term, instead of intending to pay Plaintiff what Defendants owed to him, Defendants sought to wriggle out of ever paying Plaintiff, hoping to delay collection efforts until Plaintiff simply gave up on recovering the amount.

G. **Defendants Published False, Misleading, and Injurious Statements On Their Websites Concerning Plaintiff's Cars; And Defendants Intentionally Misreported Sales To Plaintiff**

71.    In view of the issues Plaintiff encountered with Defendants, Plaintiff began conducting diligence on Defendants and reviewed their websites in an attempt to learn the status of Plaintiff's cars and Defendants' conduct with respect to them. Through this investigation, Plaintiff learned that Defendants, and each of them, were falsely advertising the sale of Plaintiff's vehicles that Defendants in fact never sold.

72.    First, with regard to several other of Plaintiff's cars that he had originally furnished to Defendants under the Sales Agreement but revoked Defendants' power to sell by the Amendment, Defendants falsely published on their websites that they had in fact sold these cars. These statements were knowingly false when made and published to the public recklessly and, on information and belief, with malice, oppression, and the intention to disrupt Plaintiff's actual attempts to sell these cars because Plaintiff had revoked Defendants' permission to do so. In addition, on information and belief, Defendants published these false statements about purported sales of Plaintiff's vehicles to enrich themselves, with the intent to deceiving the public into believing they had experience in selling such rare and high-end cars.

73.    For example, although Defendants never sold Plaintiff's 1956 Volpini Formula Jr. car (1 of 3 in existence), and which was never in Defendants possession, by May 9, 2022, Defendants published on the Sonic Bidder website that they had in fact sold Plaintiff's Volpini for $120,000. This statement by Defendants is demonstrably false, as this car remains in Plaintiff's possession.

THOITS LAW
A PROFESSIONAL CORPORATION

74.     Although Defendants never sold Plaintiff's 1957 Scarab Formula 1 (ex-Lance Reventflow car) and it had been returned to Plaintiff's possession, by May 1, 2022, Defendants published on The Vault's website that they had sold the same car for $5,000,000. By May 9, 2022, Defendants published on the Sonic Bidder website they had in fact sold the same for $735,000. These statements are demonstrably false, as this car remains in Plaintiff's possession.

75.     Although Defendants claimed to have purchased Plaintiff's 1962 Lotus 20/22 Formula Jr. from Plaintiff for $120,000, Defendants never paid Plaintiff. Despite the foregoing, by May 1, 2022, Defendants published on Sonic Bidder's website that they had sold the same vehicle for $52,000.

76.     Although Defendants never sold Plaintiff's 1962 Lotus 22 Formula Jr. race car which was never in Defendants possession, by May 1, 2022, Defendants published on Sonic Bidder's website that they had sold the same car for $62,000. This statement by Defendants is demonstrably false, as this car remains in Plaintiff's possession, custody and control.

77.     Although Defendants never sold Plaintiff's 1983 Ram March (ex-Jacques Villeneuve car) and it had been returned to Plaintiff's possession, by May 1, 2022, Defendants published on The Vault's website that they had sold the same car for $450,000. By May 9, 2022, Defendants published on Sonic Bidder's website that they had sold the same vehicle for $280,000, an outrageously low value for the vehicle. These statements by Defendants are demonstrably false, as this car remains in Plaintiff's possession, custody and control.

78.     Although Defendants never sold Plaintiff's 2003 Lola F3000 2-seater race car, by May 1, 2022, Defendants published on The Vault's website that they had sold the same for $185,000. By May 9, 2022, Defendants published on Sonic Bidder's website they had sold the same vehicle for $15,000, an absurdly low value. These statements by Defendants are demonstrably false, as this car remains in Plaintiff's possession.

79.     Although Defendants never sold Plaintiff's Ford/IVECO Ferrari Schumacher Team motorhome, by May 9, 2022, Defendants published on Sonic Bidder's website that they had sold the same vehicle for $130,000. This statement by Defendants is demonstrably false, as this car remains in Plaintiff's possession.

80.     Although Defendants never sold Plaintiff's 1964 Ferrari 275 GTB and it had been returned to Plaintiff's possession, by May 1, 2022, Defendants published on The Vault's website that they had sold the same car for $3,200,000. By May 9, 2022, Defendants published on Sonic Bidder's website that they had sold the same vehicle for $1,835,000. These statements by Defendants are demonstrably false, as this car remains in Plaintiff's possession.

81.     As a direct and proximate result of these false statements to the public, the value of each of Plaintiff's cars that were not sold by Defendants that they claimed were sold by them have been severely negatively impacted. In particular, Defendants' false advertisements create confusion as to who owns the actual title to the vehicles, and gives rise to doubt among potential buyers (who typically research the vehicles they purchase to ensure authenticity) concerning the provenance of the vehicles.

82.     Because Defendants advertised they had sold Plaintiff's vehicles on certain dates when they had not, the direct conflict between any truthful statement of ownership made by Plaintiff and the false representations published to the public by Defendants creates an innate question of which is true, and inherently calls into question the authenticity and provenance of the vehicles.

83.     Because of Defendant's reckless and intentional conduct, Plaintiff has already had to address these issues with potential buyers of several of these cars. In short, potential buyers (of which there are not many anyway) have been deterred from purchasing Plaintiff's vehicles as a result of the seemingly conflicting information concerning Plaintiff's vehicles, although the statements giving rise to that conflict are entirely false.

THOITS LAW
A PROFESSIONAL CORPORATION

84.    Second, in addition to sowing doubt among potential purchasers of Plaintiff's vehicles as to their authenticity and provenance, Defendants' false statements concerning these sales that never happened included false statements of pricing, which were lower than the fair market value of Plaintiff's cars. These false statements harmed the value of Plaintiff's vehicles, because Defendants through their knowing and intentional false statements seek to convince the public that the values of Plaintiff's vehicles are far less than they truly are.

85.    Specifically, with regard to several of Plaintiff's vehicles, The Vault's website specified one sale price while Sonic Bidder's website specified a completely different price, often much higher than the price advertised by The Vault's website, and certainly much higher than the prices Defendants reported to Plaintiff for the sales of his vehicles.

86.    Although Defendants reported to Plaintiff they had sold his first 1975 Bricklin SV1 for only $12,000 ($18,000 under asking price of $30,000), The Vault's website asserted as of about May 1, 2022, that the same vehicle was actually sold for $30,000. By about May 9, 2022, Sonic Bidder's website had published that the same vehicle had sold for $8,250.

87.    Although Defendants reported to Plaintiff they had sold his first 1975 Rolls Royce Silver Shadow limousine (the former In-N-Out Burger family limousine) for only $12,000 ($33,000 under asking price of $45,000), The Vault's website asserted as of about May 1, 2022, that the same vehicle was actually sold for $45,000. By about May 9, 2022, Sonic Bidder's website had published that the same vehicle had sold for $12,000.

88.    Although Defendants reported to Plaintiff they had sold his 1981 BMW M1 (3 owner car with full history) for $400,000 ($200,000 under asking price of $600,000), by about May 9, 2022, Sonic Bidder's website had published that the same vehicle had actually sold for $440,000, which gave rise to the misrepresentation that there was a 4% commission for this vehicle, although

THOITS LAW
A PROFESSIONAL CORPORATION

Defendants had assured Plaintiff they would not charge a commission on this vehicle because it sold for such a low price.

89.    Although Defendants reported to Plaintiff they had sold his first 1982 Ferrari Mondial 8 for $25,000 ($10,000 under asking price of $35,000), The Vault's website asserted as of about May 1, 2022, that the same vehicle was actually sold for $45,000. By about May 9, 2022, Sonic Bidder's website had published that the same vehicle had sold for $25,000.

90.    Although Defendants reported to Plaintiff they had sold his first 1982 Porsche 928-S for $26,000 ($1,000 over asking price of $25,000), The Vault's website asserted as of about May 1, 2022, that the same vehicle was actually sold for $25,000. By about May 9, 2022, Sonic Bidder's website had published that the same vehicle had sold for $26,000.

91.    Although Defendants reported to Plaintiff they had purchased his 1985 Rolls Royce limousine for $11,500 ($10,500 under asking price of $22,000), The Vault's website asserted as of about May 1, 2022, that the same vehicle was actually sold for $32,000. By about May 9, 2022, Sonic Bidder's website had published that the same vehicle had sold for $12,000.

92.    Although Defendants reported to Plaintiff they had sold his 1953 Puma for $16,500, The Vault's website asserted as of about May 1, 2022 that the same vehicle was actually sold for nearly double that at $32,000. By about May 9, 2022, Sonic Bidder's website had published that the same vehicle had sold for $16,500.

93.    In sum, although Defendants provide numerous conflicting statements to the public (which conflict with Defendants' representations to Plaintiff concerning the sales and sales prices of his cars), on information and belief, Defendants sold Plaintiff's vehicles for much more than they reported to Plaintiff so as to retain the difference for themselves, although they had no right to such portions of the proceeds from the sale of any of those vehicles.

THOITS LAW
A PROFESIONAL CORPORATION

94.     Furthermore, at all times relevant hereto, Defendants as parties purporting to have been extremely experienced in the specialty car sale industry, knew or should have known that their misconduct as alleged herein would have a direct and proximate negative impact on Plaintiff, namely that (a) Defendant's false statements that Plaintiff's vehicles sold for drastically lower values than their fair market value would harm the value of Plaintiff's cars where those cars were not actually sold, or where they were sold for far more, and (b) Defendant's false statements that they sold Plaintiff's cars when they had not would create innate questions about the authenticity and provenance of Plaintiff's  vehicles, making them nearly impossible for Plaintiff to sell, or impossible to sell anywhere near their fair market value.

95.     In or about mid-June 2022, Plaintiff sent to Defendants a demand letter seeking payment in full for the $672,525.00 owed to him, plus an accounting of all sales of Plaintiff's vehicles to determine what vehicles were actually sold for what price. That letter went ignored by Plaintiff who remains deprived of several hundred thousand dollars and his 1997 Ferrari 456 GTA.

96.     On information and belief, Defendants knowingly and intentionally, with malice, oppression, and fraud: induced Plaintiff into entering into agreements for the sale of his investments to siphon money from Plaintiff by way of his personal property; through fraudulent and misrepresented sales and sales figures; and by taking advantage of Plaintiff's distance from Defendants and his constant work travel schedule to delay and ultimately avoid payment of substantial funds owed to Plaintiff.

97.     At all times material hereto, each of The Vault and Sonic Bidder knew of Pass' wrongful, intentional, malicious, and fraudulent conduct and ratified the same.

H. **Defendants' Fraudulent Publications To The Public Damaged Plaintiff's Ability To Sell His Cars For Their Fair Market Value**

THOITS LAW
A PROFESSIONAL CORPORATION

THOITS LAW

A PROFESSIONAL CORPORATION

98.    Defendants' above described fraudulent and misleading publications of "fact" to the public with regard to the sale of Plaintiff's vehicles and their pricing caused extreme damage to the value of those vehicles. The car collector world is a small one, especially to the extent it concerns collecting rare and historical Formula level race cars like those Plaintiff had initially contracted with The Vault to sell. In that world, collectors considering the purchase of these rare and often 1 of 1 vehicles, given their unique histories, do extensive research concerning their prospective purchases, in no small part because the cost of these vehicles can range from the mid-hundred thousand dollars to millions of dollars.

99.    When Pass first broached his plan to expand his auction companies' market in locations abroad where he had previously not reached, he and Plaintiff discussed the Monaco Grand Prix, namely that it was the prime place to sell Plaintiff's high end, Formula race cars. After Plaintiff began to lose faith in Defendants, and after it became clear that Pass had intentionally worked to avoid contact with Plaintiff, Plaintiff hired a private investigator and his private security to retrieve the Plaintiff's cars from Defendants and ensure their transportation home to California. This venture cost Plaintiff about $27,000.

100.    Plaintiff regained possession of his vehicles that were transported to Defendants: the Scarab, a $1,200,000 car, and the two race cars which Pass never had custody of, the Volpini, which was worth well over the $125,000 asking price and the 1962 LOTUS 22 Formula Jr. race car worth at least the $135,000 asking price.

101.    Once again in his possession, Plaintiff pursued options other than Defendants to sell his cars in Monaco at the next Grand Prix. To do this, Plaintiff engaged RM Auctions ("RM"), a well-known auction house known to sell high end automobiles. While Plaintiff noted he wanted to sell the cars with a reserve, ultimately RM listed both the Volpini and the LOTUS without a reserve. At the Monaco auction, the Volpini sold for about $25,000 and the Lotus sold for about

$35,000. The Scarab was listed with a reserve of $750,000 and was not sold.

102.   When Plaintiff saw the results of the auction, he was shocked and appalled. RM informed Plaintiff that there were at least two potential buyers for the Scarab before the auction, but after RM disclosed all of the information it had about the Scarab's sale history from the diligence research RM conducted ahead of the auction, no bids reached near the reserve price. The research RM disclosed specifically concerned the multiple purported sales of the car on Sonic Bidder's and The Vault's websites—in particular, the same car was purported sold on The Vault's website for a total of $5,000,000 and again on Sonic Bidder's website for $735,000 at the same time. This discrepancy in price and origin of sale gave rise to a question of authenticity of the Scarab, its provenance, and sales price history, so much so that potential buyers became distrustful of the car and were no longer willing to spend between $750,000 and $1,200,000 on the same.

103.   The Vault's and Sonic Bidder's websites had the same effect on the Lotus and Volpini. Both cars were sold without a reserve, a decision that RM made in view of the research it conducted on the cars. It became clear that buyers felt the same distrust as they had with the Scarab. Although neither The Vault nor Sonic Bidder had ever sold the Volpini, Sonic Bidder reported by May 9, 2022, that it sold the same car for $120,000. This created an inherent question as to the authenticity of the car Plaintiff offered for sale at the RM auction.

104.   Although neither The Vault nor Sonic Bidder had ever sold the Lotus, by May 1, 2022, The Vault reported the same car as recently sold for $62,000. This created an inherent question as to the authenticity of the car Plaintiff offered for sale at the RM auction. In addition, this arbitrary and exceptionally low price purported to assert that the value of the Lotus was a fraction of its actual fair market value.

105.   As a result of Defendants' fraudulent publications concerning their fraudulently reported sales of the Volpini and the Lotus, both were sold at a

THOITS LAW
A PROFESSIONAL CORPORATION

fraction of their fair market value. At the RM auction, the Volpini was sold for only $25,000, and the Lotus was sold for only $35,000. As a direct and proximate result of Defendants' fraudulent misrepresentations to the public, (a) Plaintiff was unable to sell his Scarab, and has since been unable to sell his Scarab; and, (b) as exemplified by the two disastrous auctions of the Volpini and the Lotus, Plaintiff's cars were severely devalued by the public such that they sold for a collective $200,000 less than their fair market value.

106.   Likewise, Plaintiff had significant difficulty selling his Ferrari 275, a car that is highly desirable for collectors of classic cars.  Like the aforementioned vehicles, Plaintiff exerted efforts to sell the Ferrari 275 after he had regained possession of his vehicle from Defendants.

107.   The Ferrari 275 that was worth $2,200,000 ultimately sold for drastically low by comparison: $1,450,000. After the sale, the broker who sold the Ferrari 275 on behalf of Plaintiff sent Plaintiff a letter in which he noted that the issues that plagued Plaintiff's attempts to sell the Volpini, Lotus, and Scarab made it near impossible to sell the Ferrari 275 for its fair market value or for anything more than a fraction of what it was worth. In particular, the false and assertions of fact published by Defendants on their websites overexposed the car in that the two websites showed the car sold by two different parties at the same time: The Vault showing the Ferrari 275 sold for $3,200,000 while Sonic Bidder showing the Ferrari 275 sold for $1,835,000. In sum, because of Defendants' false publications to the public concerning the "sales" of the Ferrari 275 that never happened, its authenticity and provenance, as well as its sales history, were all so seriously called into question, that Plaintiff could not sell the Ferrari 275 for nearly its fair market value, ultimately having to sell the vehicle for about $750,000 less than what it was worth.

//

//

THOITS LAW
A PROFESSIONAL CORPORATION

# FIRST CLAIM FOR RELIEF

## Conversion

### (*Against All Defendants*)

108.   Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

109.   Defendants converted Plaintiff's personal property in the 1997 Ferrari 456 GTA when they sold the same without authorization from Plaintiff.

110.   Defendants were well aware from the execution of the Amendment that revoked both their permission to sell any of Plaintiff's vehicles and The Vault's power of attorney under the Sales Agreement, that they did not have permission to sell or otherwise dispose of Plaintiff's 1997 Ferrari 456 GTA.

111.   Despite this knowledge that pass acknowledged by signing the Amendment, one month later, Defendants sold Plaintiff's 1997 Ferrari 456 GTA with the intent to permanently deprive him of the same.

112.   As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

113.   Defendants additionally converted Plaintiff's money in the amounts outstanding that remain due and owing to Plaintiff for the sale of his cars.

114.   Upon information and belief, Defendants never intended to pay Plaintiff any of the amounts they received on behalf of Plaintiff for the sale of his cars. Only because Plaintiff pressed Defendants for his payments, Defendants did ultimately make some payments to Plaintiff with the intention to stave off further attempts by Plaintiff to collect the remainder of the amounts owed to him.

115.   Each and every time Plaintiff raised the issue of non-payment, Pass had some new excuse for Plaintiff, which was intentional and designed to avoid further paying Plaintiff what Defendants owed him.

116.   Despite Plaintiff's last communication with Defendants in March of 2022 by which Plaintiff informed Defendants that their non-response indicated to

COMPLAINT

140051.001/2060399

him their intention not to respond further regarding the payments, Defendants affirmed this fact when they failed to ever respond to Plaintiff. To date Defendants received $275,374 that was intended for Plaintiff for the sale of his cars, which Defendants have intentionally kept for themselves. In addition, they undertook efforts to prevent Plaintiff from ever receiving those funds.

117.   In short, Defendants took Plaintiff's money with the intent of permanently depriving him of it, and to date they have done so. As a direct and proximate result, Plaintiff suffered damages in the amount to be proven at trial.

118.   Furthermore, at all times material hereto, Defendant Pass and through him, Defendants, knew that Plaintiff sought to sell his cars to free up cash for renovations to his home to avoid having to use savings to do so. Defendants conduct described herein was at all times reckless and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, and attorneys' fees as permitted by law.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

### (*Against All Defendants*)

119.   Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

120.   Prior to the execution of the Sales Agreement, Plaintiff, Pass, and The Vault agreed upon the material terms of the same, orally and through electronic communications. Ultimately, Plaintiff and The Vault executed the Sales Agreement for the sale of Plaintiff's cars as set forth hereinabove.

121.   At all times material thereto, Pass was employed by The Vault and acted for and on behalf of The Vault. Pass signed the Sales Agreement on behalf of The Vault. Further, at all times material hereto, Pass is the owner of Sonic Bidder, which facilitates car auctions on behalf of The Vault and Pass by selling the inventory the two put up for auction and sale.

THOITS LAW
A PROFESSIONAL CORPORATION

122.   Pass and The Vault breached the Sales Agreement by failing to sell Plaintiff's cars for the minimum lowest amounts stated hereinabove and as required by the Sales Agreement. In several instances, Defendants sold Plaintiff's cars for drastically lower amounts than the agreed upon amounts specified in the Sales Agreement. As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

123.   Pass and The Vault further breached the Sales Agreement when they failed to make payment to Plaintiff within the thirty (30) days of each sale of Plaintiff's cars. Payment to Plaintiff within thirty (30) days of a sale of any of Plaintiff's cars was a material term of the Sales Agreement.

124.   Defendants further breached the payment terms of their agreement to sell Plaintiff's cars for and on behalf of Plaintiff when they failed to pay Plaintiff at all for amounts that remain outstanding under the Sales Agreement.

125.   As a direct and proximate result of the foregoing breaches of the Sales Agreement, Plaintiff has suffered damages in an amount no less than $275,374, to be proven at trial.

126.   In or about November 2022, Pass and The Vault entered into the Amendment with Plaintiff, which amended the terms of the Sales Agreement.

127.   In addition to their breaches of the Sales Agreement, Defendants Pass and The Vault breached the terms of the Amendment when Defendants sold Plaintiff's 1997 Ferrari 456 GTA after the Amendment was executed. The Amendment explicitly prohibited Defendants from making any further sales of Plaintiff's vehicles. Instead, Defendants took advantage of the fact that Plaintiff resided on the other side of the country and traveled abroad for work almost constantly. They decided to permanently dispose of Plaintiff's 1997 Ferrari 456 GTA behind his back and in blatant violation of the terms of the Amendment, both selling it without permission and retaining the monies they received from the same without ever intending to pay Plaintiff any portion of the sale amount.

128.   Furthermore, Defendants violated the Amendment when they sold Plaintiff's 1997 Ferrari 456 GTA before entering into a new agreement with Plaintiff to sell his vehicles and before the Defendants paid Plaintiff the $672,525 they owed him at the time.

129.   Paragraph 4 of the Amendment explicitly states that none of The Vault, its agents or representatives, *i.e.*, Pass, shall cause or permit the sale of any other Property or vehicles of Plaintiff until both of these conditions are met. Moreover, the Amendment revoked entirely Defendants' power of attorney that was previously granted under the Sales Agreement.

130.   Despite the explicit terms of Paragraph 4 of the Amendment, Defendants sold Plaintiff's 1997 Ferrari 456 GTA without his permission or authorization, and without satisfying the terms of Paragraph 4.

131.   As a direct and proximate result of the foregoing, Plaintiff has suffered damages in an amount to be proven at trial.

132.   At all times material hereto, Pass and through him The Vault and Sonic Bidder, knew Plaintiff sought to sell his cars to free up cash for renovations to his home to avoid having to use savings to do so. Defendants conduct described herein was at all times reckless and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages.

## THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (*Against Pass and The Vault*)

133.   Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

134.   Defendants Pass and The Vault, and both of them, owed Plaintiff a fiduciary duty to act for and on behalf of Plaintiff to sell his vehicles for the best, reasonable return to Plaintiff as set forth hereinabove, which inherently included safeguarding payment to Plaintiff for payment under the terms of the Sales

THOITS LAW
A PROFESSIONAL CORPORATION

Agreement. While The Vault's fiduciary relationship was additionally set forth in the Sales Agreement, the relationship between Pass in his individual capacity, and Plaintiff was that of an agency relationship, whereby Plaintiff entrusted both Pass and The Vault to sell his vehicles for the best possible return to Plaintiff as described herein. Under the terms of the Sales Agreement, The Vault was granted power of attorney to perform the terms of the Sales Agreement and the acts thereunder for and on behalf of Plaintiff.

135.   Inherent in the scope of these agency relationships were Defendants' handling of Plaintiff's personal property and funds. Their fiduciary duties included duties of loyalty and to act in Plaintiff's best interest, and to refrain from usurping opportunities from Plaintiff with regard to the sale of his property.

136.   On information and belief, Pass and The Vault both violated their fiduciary duties when they, used Plaintiff's property as pawns to complete deals favorable to Defendants, in particular, by selling Plaintiff's property for far below the minim agreed upon sale prices, and well below market value. In addition, Defendants engaged in wrongful self-dealing by purchasing at least two of Plaintiff's vehicles for prices drastically lower than the minimum agreed upon sale price, and well below market value. Defendants further breached these duties to Plaintiff when they failed to pay him for these cars.

137.   Next, Defendants breached their fiduciary duties to Plaintiff when they sold Plaintiff's 1997 Ferrari 456 GTA after Pass signed the Amendment to the Sales Agreement, which revoked any permission or right Defendants had to sell Plaintiff's vehicles. Worse, Defendants further breached their fiduciary duties when they refused to pay Plaintiff for his 1997 Ferrari 456 GTA.

138.   As a direct and proximate result of Pass' and The Vault's breaches of their fiduciary duties to Plaintiff, Plaintiff has been damaged in an amount of at least several hundred thousand dollars, to be proven at trial.

139.   Defendants' conduct described herein was at all times reckless and

THOITS LAW
A PROFESSIONAL CORPORATION

conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, and attorneys' fees as permitted by law.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty

### (*Against Pass and Sonic Bidder*)

140.   Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

141.   Sonic Bidder, through Pass, at all times material hereto, knew or had reason to know of Pass' and The Vault's breaches of their fiduciary duties to Plaintiff under the Sales Agreement and the Amendment.

142.   Despite this knowledge, Sonic Bidder knowingly encouraged and assisted Pass and The Vault in selling Plaintiff's 1997 Ferrari 456 GTA without his permission, and in violation of the Amendment to the Sales Agreement and Pass and The Vault's fiduciary duties to Plaintiff thereunder. Specifically, on information and belief, Sonic Bidder advertised and facilitated the sale of Plaintiff's vehicle at the "Christmas Around the World" auction hosted by Sonic Bidder with inventory sourced by Pass and maintained by The Vault.

143.   As a direct and proximate result of Sonic Bidder's conduct, and the conduct of Pass and The Vault, Plaintiff has been damaged in an amount to be proven at trial, and no less than the value of the 1997 Ferrari 456 GTA sold without Plaintiff's permission or right to do so.

144.   As to each and every one of the sales Defendants Pass and The Vault made of Plaintiff's cars that was for a price lower than the minimum sales price set by Plaintiff, Sonic Bidder knew or had reason to know through Pass that the sales prices should have been higher than what the cars were ultimately sold for. Despite this knowledge, Sonic Bidder facilitated the auctions at which Plaintiff's vehicles were sold for less than the minimum sales price set by Plaintiff.

145.   As set forth above, Sonic Bidder and Defendants sold Plaintiff's cars

THOITS LAW
A PROFESSIONAL CORPORATION

for such lesser amounts to service their own pecuniary gain while disregarding the rights of Plaintiff and, for Pass and The Vault, disregarding their fiduciary duties to Plaintiff. By these actions, Sonic Bidder encouraged and assisted Pass and The Vault in their breaches of their fiduciary duties to Plaintiff.

146.   In addition, as to each and every one of The Vault's breaches of its fiduciary duties, Defendant Pass knowingly and intentionally encouraged and assisted The Vault in that conduct by carrying it out directly, with the direct knowledge that the same conduct breached The Vault's fiduciary duties to Plaintiff, which Pass possessed because Pass signed the Sales Agreement and the Amendment on behalf of The Vault after negotiating their terms with Plaintiff.

147.   At all times material hereto, Defendant Pass, and through him Defendants The Vault and Sonic Bidder, knew Plaintiff sought to sell his cars to free up cash for renovations to his home to avoid having to use savings to do so.

148.   Defendants' conduct described herein was at all times reckless and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, and attorneys' fees as permitted by law.

## FIFTH CLAIM FOR RELIEF

### Intentional Misrepresentation

### (*Against All Defendants*)

149.   Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

150.   Defendants Pass and The Vault through Pass represented that they could sell each of Plaintiff's cars for the minimum prices set forth herein; and again when they represented they had a buyer "committed to buy" Plaintiff's Ferrari 275 for $2,200,000. Pass and The Vault represented to Plaintiff that these "facts" were true.

151.   However, Defendants' representations were not true. Further, Pass and The Vault knew these representations were false when they made them, or

otherwise made them recklessly without regard for their truth.

152. By making their many representations concerning the sales of Plaintiff's vehicles, Defendants intended that Plaintiff rely on those representations and, ultimately, Plaintiff did when he engaged The Vault to sell his cars, and again when Plaintiff agreed to sell his BMW M1 for $200,000 less than its minimum agreed price and fair market value, after Pass told Plaintiff that he would make up that difference on the sale of the Ferrari 275.

153. As a direct and proximate result of Plaintiff's reliance on Pass' and The Vault's representations, which was a substantial factor in the harm Plaintiff suffered, Plaintiff was injured in an amount of over several hundred thousands of dollars to be proven at trial.

154. Defendants' conduct described herein was at all times reckless and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, and attorneys' fees as permitted by law.

## SIXTH CLAIM FOR RELIEF

### Negligent Misrepresentation

### (*Against Pass and The Vault*)

155. Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

156. Defendants Pass and The Vault through Pass represented that they could sell each of Plaintiff's cars for the minimum prices set forth herein; and again when they represented they had a buyer "committed to buy" Plaintiff's Ferrari 275 for $2,200,000. However, Defendants' representations were not true and, even if Defendants honestly believed their representations were true, they had no reasonable grounds for believing their representations were true when they made them to Plaintiff.

157. By making their many representations concerning the sales of Plaintiff's vehicles, Defendants intended that Plaintiff rely on those

THOITS LAW

A PROFESSIONAL CORPORATION

representations and, ultimately, Plaintiff did when he engaged The Vault to sell his cars, and again when Plaintiff agreed to sell his BMW M1 for $200,000 less than its minimum agreed price and fair market value, after Pass told Plaintiff that he would make up that difference on the sale of the Ferrari 275.

158.   As a direct and proximate result of Plaintiff's reliance on Pass' and The Vault's representations, which were a substantial factor in the harm Plaintiff suffered, Plaintiff was injured in an amount to be proven at trial.

159.   Defendants' conduct described herein was at all times reckless and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, and attorneys' fees as permitted by law.

## SEVENTH CLAIM FOR RELIEF

### Constructive Fraud (Violation of CAL. CIV. CODE § 1573)

### (*Against Pass and The Vault*)

160.   Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

161.   Both Pass and The Vault were Plaintiff's agents in the performance of the The Vault's obligations under the Sales Agreement, who were to represent Plaintiff and act on his behalf in the sale of his vehicles as set forth herein.

162.   However, both Pass and The Vault knew quite well they did not have the experience or clientele that Pass represented to Plaintiff that they had. Pass misled Plaintiff by failing to disclose this information and further, by lying to Plaintiff asserting he could sell Plaintiff's vehicles for the minimum prices set by Plaintiff, and later by asserting that he had buyers lined up for several of Plaintiff's cars. In particular, Pass new he did not have a buyer who "had already committed" to buying Plaintiff's Ferrari 275 for $2,200,000, however, Pass made this false misrepresentation to Plaintiff anyway.

163.   As a result, Plaintiff was harmed – first, by having been induced by Pass' false misrepresentations as to his experience selling cars of Plaintiff's

THOITS LAW
A PROFESSIONAL CORPORATION

vehicle's caliber, including the same such type cars; and second, by agreeing to sell his BMW M1 for $200,000 below its initial minimum agreed upon amount and fair market value because Pass represented there was already someone committed to buying the Ferrari 275 that would "make it up," referring to the difference that Plaintiff would lose on the BMW M1 when he agreed to sell it under these conditions. That never happened, and Plaintiff lost $200,000 of the fair market value of this BMW M1.

164.   At all times material hereto, Defendant Pass, and through him Defendants The Vault and Sonic Bidder, knew Plaintiff sought to sell his cars to free up cash for renovations to his home to avoid having to use savings to do so.

165.   Not only was Pass' and The Vault's conduct a substantial factor in causing Plaintiff's harms, Defendants' conduct was at all times reckless and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, and attorneys' fees as permitted by law.

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment

### (*Against All Defendants*)

1.       Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

2.       As a result of Defendants' conduct as set forth above, Plaintiff has lost hundreds of thousands of dollars in the value of his vehicles due to Plaintiff's false and misleading publications of "fact" to the public concerning the sales of his vehicles that never happened, because Defendants sold Plaintiff's cars drastically below the agreed upon minimums and fair market value as set forth above, because Defendants have simply not paid him what they owe him under the terms of the Sales Agreement, and because Defendants sold Plaintiff's 1997 Ferrari 456 GTA without his authorization or permission and retained the proceeds for themselves.

THOITS LAW
A PROFESSIONAL CORPORATION

3.      By their intentional wrongful acts and omissions, Defendants, and each of them, were unjustly enriched at the expense of and to the detriment of Plaintiff. In particular, Defendants were unjustly enriched by the amounts they retained as a result of the above identified sales, which they gained in violation of the Sales Agreement and Amendment. Furthermore, Defendants were unjustly enriched by holding themselves out as having the experience of selling Plaintiff's rare and very high end collectible and racing cars, although Defendants never did actually sell those vehicles on behalf of Plaintiff.

4.      As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged and is entitled to restitution from Defendants and seeks an order from this Court disgorging all monies paid to Defendants as a result of their illegal, deceptive, unfair, and/or fraudulent business practices for which Plaintiff has no adequate remedy at law.

## NINTH CLAIM FOR RELIEF

### Violation of CAL. BUS. & PROF. CODE §§ 17200 and 17500 *et seq*.

### (*Against All Defendants*)

5.      Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

6.      Upon information and belief, Plaintiff alleges that, unless enjoined by order of the Court, Defendants will continue to operate their websites for their sole benefit and to the detriment of Plaintiff. No adequate remedy exists at law for the injuries alleged, and Plaintiff will continue to suffer great and irreparable injury if Defendants' conduct is not immediately enjoined and restrained.

7.      As set forth above, Defendants forever damaged the values and histories of the vehicles Plaintiff sold after he obtained the return of his cars from Defendants. Plaintiff still cannot find an appropriate buyer for the Scarab race car because of the damage done by Defendants' false publications concerning the Scarab on their websites. If Defendant's conduct in this manner is not restrained

THOITS LAW
A PROFESSIONAL CORPORATION

and enjoined, Plaintiff will suffer great and irreparable harm, as he has already been unable to sell the Scarab for near its fair market value as a result of Defendants' false publications, and Defendants seem committed to continuing their unfair and unlawful business practices of maintaining websites that display to the public false information concerning the Scarab.

8.      Plaintiff has no adequate remedy at law for this ongoing injury.

**TENTH CLAIM FOR RELIEF**

**Declaratory Relief**

**(*Against All Defendants*)**

1.      Plaintiff realleges and incorporates by reference each and every allegation contained in each of the above paragraphs as if fully set forth herein.

2.      Under California Code of Civil Procedure § 1060, et seq., a court may declare rights, duties, statuses, and other legal relations, regardless of whether further relief is or could be claimed.

3.      An actual controversy has arisen between Plaintiff and Defendants as to their respective rights and obligations under the Sales Agreement, the Amendment, and with respect to Defendants unlawful conduct as alleged herein after the execution of the Amendment.

4.      Resolution of the parties' respective rights and duties with regard to Defendants' false and injurious conduct by declaration is necessary, as there exists no adequate remedy at law.

5.      Plaintiff alleges that Defendants wrongfully disposed of Plaintiff's 1997 Ferrari 456 GTA without Plaintiff's authorization or any other right to do so, and have failed to make any payment for the same to Plaintiff.

6.      Plaintiff alleges that when Defendants wrongfully disposed of Plaintiff's 1997 Ferrari 456 GTA, that they were aware that they had no right to do so, because Pass had signed the Amendment on behalf of The Vault, and the Amendment explicitly revoked any authority any of Defendants ever had to sell

THOITS LAW
A PROFESSIONAL CORPORATION

or otherwise dispose of Plaintiff's personal property, including the 1997 Ferrari 456 GTA.

7.    Plaintiff alleges that Defendants' wrongful disposal of Plaintiff's 1997 Ferrari 456 GTA without Plaintiff's authorization or any other right to do so is a material breach of the Amendment to the Sales Agreement; and, as a result, Defendants are jointly and severally liable for damages to Plaintiff in the amount of the fair market value of the vehicle at the time Defendants disposed of it.

8.    Plaintiff alleges that Defendants' wrongfully depriving Plaintiff of his 1997 Ferrari 456 GTA while having direct knowledge that they had no right or authorization to deprive Plaintiff of that property or otherwise dispose of it is a violation of CAL. PEN. CODE § 496(a).

9.    Plaintiff alleges that, as a result of Defendants' misconduct, Plaintiff is entitled to attorneys' fees and treble damages under CAL. PEN. CODE § 496(c).

10.    Plaintiff alleges that Defendants have published false information concerning the sale of Plaintiff's vehicles as set forth herein above, including but not limited to falsely stating Defendants have sold Plaintiff's Ferrari 275, Lotus race car worth over half a million dollars, and Plaintiff's Scarab race car worth over a million dollars as described hereinabove.

11.    Plaintiff alleges that Defendants have published false information concerning the sale prices of Plaintiff's vehicles as set forth herein above.

12.    Plaintiff alleges that Defendants' publishing of false information directly and proximately wrongfully devalued Plaintiff's Lotus 22 race car having a fair market value of at or above $135,000, such that Plaintiff could only sell the Lotus 22 for about $35,000; and, as a result Defendants are jointly and severally liable for damages to Plaintiff in the amount of $100,000.

13.    Plaintiff alleges that Defendants' publishing of false information directly and proximately wrongfully devalued Plaintiff's Volpini race car having a fair market value of at or above $125,000, such that Plaintiff could only sell the

THOITS LAW
A PROFESSIONAL CORPORATION

Volpini for about $25,000; as a result Defendants are jointly and severally liable for damages to Plaintiff in the amount of $100,000.

14.     Plaintiff alleges that Defendants' publishing of false information directly and proximately wrongfully devalued Plaintiff's Ferrari 275 having a fair market value of about $1,200,000, such that Plaintiff could only sell the Ferrari 275 for about $1,450,000; as a result Defendants are jointly and severally liable for damages to Plaintiff in the amount of $750,000.

15.     Plaintiff alleges that Defendants owe Plaintiff a sum of $200,000 for wrongfully inducing Plaintiff to sell his BMW M1 for $200,000 under the agreed minimum price under the Sales Agreement.

16.     Plaintiff alleges that Defendants owe Plaintiff a principal sum of $275,374 in unpaid payments under the Sales Agreement.

17.     Defendants' conduct described herein was at all times reckless and intentional, and conducted with malice, oppression, fraud, and an intent to injure Plaintiff warranting special and punitive damages, attorneys' fees as consequential damages and as a fee award as a result of the foregoing.

18.     Upon information and belief, Plaintiff alleges that Defendants dispute and deny each of Plaintiff's contentions set forth in this Claim for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.     That the Court enters a judgment finding that Defendants are liable for the harms alleged herein;

2.     For a declaration adopting each of Plaintiff's contentions set forth in the above Claim for Relief for Declaratory Relief;

3.     For injunctive relief:

   a.   Enjoining and restraining Defendants' unlawful conduct as alleged herein, including but not limited to their unfair and unlawful business practices, and their publishing and advertising to the

THOITS LAW

A PROFESSIONAL CORPORATION

public false and misleading information concerning the purported

sales and sale prices of Plaintiff's cars; and

b. Ordering Defendants to return to Plaintiff all personal property

belonging to Plaintiff that remains in Defendants' possession,

custody, or control, and to turn over all such information necessary

for Plaintiff's recovery of his personal property that Defendants

disposed of without Plaintiff's authorization;

4. For restitution of all monies and personal property belonging to

Plaintiff, which Defendants have unlawfully retained for themselves and by

which they have unjustly enriched themselves;

5. An accounting of all:

a. Personal property belonging to Plaintiff, that Plaintiff entrusted to

Defendants as alleged herein, the possession of which was never

returned to Plaintiff;

b. Documents and records of Plaintiff's property and the transactions

relating thereto that are the subject of this Complaint; and

c. Monies received by Defendants or any of them for the sale or use of

Plaintiff's personal property;

6. For general and special damages, including but not limited to actual

and consequential damages in an amount to be proven at trial;

7. For exemplary and punitive damages as permitted by law;

8. For treble damages as permitted by law;

9. For costs of suit and attorneys' fees as permitted by law;

10. For disgorgement of all profits unlawfully gained by Defendants;

11. For pre-judgment interest on all interest to which Plaintiff is entitled;

12. For post-judgment interest; and

13. For such other relief as the Court may deem just and proper.

//

1

## <u>JURY DEMAND</u>

2   Plaintiff hereby demands trial by jury in the above entitled action pursuant

3  to FED. R. CIV. P. 38(b).

4

5  Dated:  April 21, 2023

**THOITS LAW**

6

7

8                                    */s/John van Loben Sels*

9                                         **John van Loben Sels**
                                         400 Main Street, Suite 250
10                                        Los Altos, California 94022
                                         Telephone: (650) 327-4200
11                                        Facsimile: (650) 325-5572
                                    Email: jvanlobensels@thoits.com
12

13                                       *Attorneys for Plaintiff,*
                                         ANTHONY NOBLES
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THOITS LAW
A PROFESIONAL CORPORATION