**Ralph C. Shelton II, Esq. 132757**
**Laurie Schiff, Esq. 140455**
**Schiff & Shelton**
Attorneys at Law
3700 Campus Drive, Suite 202
Newport Beach, California 92660
Telephone: (949) 417-2211

Attorneys for Defendants TheVaultMS.com, Sonicbidder.com and Jerry D. Pass

**UNITED STATED DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Southern Division**

ANTHONY NOBLES,

Plaintiff,

V

THEVAULTMS.COM, A Mississippi Limited Liability Company, SONICBIDDER.COM, a Delaware Limited Liability Company, and JERRY D. PASS, an individial, and DOES 1 through 10, inclusive,

Defendants.

---

THEVAULTMS.COM, A Mississippi Limited Liability Company, SONICBIDDER.COM, a Delaware Limited Liability Company, and JERRY D. PASS, an individial,

Counter-claimants,

V

ANTHONY NOBLES,

Counter-defendant.

Case No. 8:23-cv-00704-JWH (KESx)

ANSWER TO COMPLAINT BY DEFENDANTS THEVAULTMS.COM, SONICBIDDER.COM AND JERRY D. PASS AND COUNTERCLAIM BY THEVAULTMS.COM AND JERRY D. PASS AGAINST ANTHONY NOBLES

Judge: Hon. John W. Holcomb

ANSWER

Defendants THEVAULTMS.COM, LLC, a Mississippi Limited Liability Company, ("THEVAULT"), SONICBIDDER.COM, LLC, a Delaware Limited Liability Company, ("SONIC") and JERRY D. PASS, an individual ("PASS"), hereinafter collectively referred to as"Defendants", submit this Answer to the Complaint filed herein by Anthony Nobles ("NOBLES").

1. Defendants, and each of them, specifically deny the allegations contained in the following paragraphs of the Complaint:

10, 16, 17, 22, 25, 26, 27, 28, 31, 32, 33, 36 through 107, inclusive, 109 through 118, inclusive, 120 through 132, inclusive, 134 through 139, inclusive, 141 through 148, inclusive, 150 through 154, inclusive, 156 through 159, inclusive, 161 through 165, inclusive, Eighth Claim for Relief paragraphs erroneously numbered 2 through 4, inclusive, Ninth Claim for Relief paragraphs erroneously numbered 6 through 8, inclusive, and Tenth Claim for Relief paragraphs erroneously numbered erroneously numbered 3 through 18,

2. Defendants, and each of them, deny in part the following paragraph of the Complaint as noted for each 13, "Defendants conducted business within this judicial district, and to the extent this complaint alleges facts and claims arising out of a written contract, that contract was negotiated and formed in this judicial district, and a substantial part its performance took place in this judicial district."

3. Defendants, and each of them, lack sufficient information on which to admit or deny the allegations of the following paragraphs, and on that basis deny the same:

3, 4, 5, 15, 18, 19, 20, 34,

4. The following paragraphs do not require a response:

1, 2, 9, 11, 12, 14, 108, 119, 133, 140, 149, 155, 160, the first paragraph of the Eighth Claim for relief erroneously numbered “1", first paragraph of the Ninth Claim for relief erroneously numbered “5", first paragraph of the Tenth Claim for relief erroneously numbered “1".

AFFIRMATIVE DEFENSES

5. Any performance by any Defendants herein was excused by failure of consideration on the part of Plaintiff.

6. Any recovery by Plaintiff should be be offset by the amount owed to Defendant as described hereinbelow.

7. Plaintiff should take nothing under the Complaint by operation of the doctrine of unclean hands.

8. Plaintiff’s claim for breach of any oral agreement alleged in the Complaint is barred by the applicable statute of limitations set forth at *California Code of Civil Procedure* ¶339.

9. Defendants, and each of them, allege as a separate and distinct affirmative defense each and every claim set forth in the counterclaim filed concurrently with this Answer.

COUNTER-CLAIM

10. THEVAULTMS.COM, LLC, a Mississippi Limited Liability Company, (“THEVAULT”), and JERRY D. PASS, an individual (“PASS”), hereinafter collectively referred to as “COUNTERCLAIMANTS”, assert the following claims against Anthony Nobles (“NOBLES”).

FACTUAL BACKGROUND

11. In or about late Spring, 2021, NOBLES contacted THEVAULT to inquire as to the purchase of a vehicle then being offered for sale. Thereafter he spoke with PASS to discuss the potential purchase of said vehicle. During that initial conversation,

NOBLES described several vehicles he represented that he owned, and expressed an interest in selling some of the vehicles. On information and belief, said representations were intended to be believed by PASS when made.

12. PASS had been an auctioneer for decades, and at the time of the above described call he had an interest in an auction platform that conducted online live auctions of automobiles, and an interest in THEVAULT, a business that bought, sold and traded in classic, muscle and exotic automobiles. The vehicles described by NOBLES appeared, to PASS, to have marketable value. NOBLES represented that he was a doctor who owned the vehicles that were in his "private museum" located in Fountain Valley, California. On information and belief, said representations were intended to be believed by PASS when made. NOBLES claimed that he would like to sell some of the vehicles in the museum and other vehicles that he owned, and PASS advised that he would need to see the vehicles before agreeing to market them.

13. On June 30, 2021, PASS traveled to California to view the vehicles *in situ*. He was able to see them there, and they appeared to be marketable. He and NOBLES discussed some of the arrangements under which some of the cars could be marketed. PASS learned that NOBLES also wished to sell one or more vehicles that were not located at the "private museum" in California.

14. During this visit, NOBLES showed PASS a business property occupied by what NOBLES describes as his business, told PASS that NOBLES held two (2) PhD. degrees, and used the honorific "Doctor" in reference to himself.

15. After the conclusion of the visit, on July 1, 2021, PASS returned home to Mississippi. A copy of the standard sales agreement then used by THEVAULT was transmitted to NOBLES for review. PASS and NOBLES discussed the terms further, and NOBLES made changes to the agreement. NOBLES wished the commission to be lowered and modification of other terms of the agreement, and after making changes,

returned the agreement to PASS. NOBLES and PASS executed the agreement.

16. NOBLES had also claimed to have international financial contacts and partners and that he was a part of an international financial consortium from whom he could secure capital for business expansion. NOBLES expressed his interest in the online auction platform used by PASS, indicating that he felt PASS should expand to an international market and describing grand plans for NOBLES to assist with such an expansion through his international financial partners.

17. After execution of the sales agreement, PASS arranged, with the assistance of staff of THEVAULT, for the transport of vehicles from California to Mississippi for inclusion in upcoming auction events. In the arrival of the vehicles, they were delivered to the warehouse of THEVAULT, and inspected by THEVAULT's personnel, in order to determine their actual condition. PASS requested that NOBLES provide him the requisite proofs of ownership for all of the vehicles that had been transported.

18. During this period, NOBLES took possession of two vehicles from THEVAULT, a 1957 Ford Thunderbird and a Ford F550 truck, for which he agreed to pay a price total price of $156,250.00 and for which an invoice was sent to him, memorializing the agreement for the purchase of said vehicles. To date, he has never paid the agreed purchase price  those two vehicles. THEVAULT indicated, in interim reports requested by NOBLES, that said sum would be offset against any amounts owing to NOBLES under the Sales Agreement.

19. After inspection of the vehicles and proofs of ownership, PASS learned that some vehicles had undisclosed defects and repairs, and also that some had issues with proof of ownership. PASS also learned that some of the vehicles were not owned by NOBLES at all, but by corporate entities in which NOBLES held an interest, which raised questions as to his right to sell the vehicles.

20. The nature of an auction is such that bids are placed for items sold, and the highest bidder wins. The seller is able to place a "reserve", indicating the minimum amount they will accept in exchange for the item. The auctioneer is paid a commission by the seller and a buyer premium by the buyer. In preparation for auction events, THEVAULT incurs costs for cleeaning, inspecting and repairing vehicles offered, and for photographing and marketing them, including adding them to catalogs of upcoming auction to generate interest and distributing information about them in social media channels.

21. At the auctions where vehicles that had been the subject of the sales agreement referenced herein were offered, NOBLES had set reserves of his choosing. In some cases, where the reserve was not being met, he opted to lower the reserve. In some instances, he did not modify the reserve, choosing to buy the vehicle back. Some vehicles were purchased by THEVAULT as the highest bidder.

22. After sales of the vehicles that were the subject of the sales agreement, NOBLES requested and received interim reports as the events were tallied. Those reports were, by their nature, incomplete, which was known to NOBLES. After a complete review of all sales, THEVAULT was owed $28,330.00 in commission, $69,175.00 for buyer premium incurred by NOBLES as a result of "no-sales", $732.00 in reimbursable expenses for repairs to the vehicles, as well as additional monies for commission of vehicles sold with the permission of NOBLES prior to auction, plus the premiums and commissions incurred by way of buybacks by NOBLES of vehicles consigned for auction in an amount between $168,050.00 and $336,100.00, according to proof.

23. On November 24, 2021, NOBLES was sent $124,320.00 by wire and on December 16, 2021 he was sent another $304,550.00 by wire, for a total of $428,870.00.

24. During the period between June 2021 and November 2021, NOBLES requested from PASS on a number of occasions the disclosure of financial information that NOBLES claimed was to be used to raise capital in order to expand the business of PASS to an international reach. NOBLES told PASS that NOBLES was in talks with an international banking groupo and that he had met with them while at the Monaco Grand Prix. NOBLES sent PASS a document titled "EXECUTIVE SUMMARY" that was prepared by or at the direction of NOBLES for PASS to review and sign, which described the business known as SONICBIDDER.COM, LLC, and its operations and presented it as an investment opportunity, which PASS understood to be a part of the efforts NOBLES was making to raise capital through attracting investors. In November, 2021, NOBLES stated to PASS that he had secured a loan of $5,000,000.00 for PASS, and then stated that the funds would be divided one half to PASS and one-half to NOBLES. At this point, PASS reflected that this was a loan to him that would have to be repaid by him, but that NOBLES was proposing to receive one half of the loan proceeds. The transmission of the "EXECUTIVE SUMMARY" was by way of a request that it be electronically signed through the Adobe platform, by which the recipient clicks on portions of a document presented for signature, and which PASS clicked, so that it bears a digital representation of having been signed by him. It also included an amendment to the sales agreement than had not previously been discussed with or presented to PASS or any representative of THEVAULT, and which purported to modify the terms of the sales agreement, establishing an amount "owed" to NOBLES which NOBLES knew to be inaccurate. PASS clicked the document believing that he was electronically signing the "EXECUTIVE SUMMARY", and as a result also clicked the amendment to the sales agreement.

25. PASS had been previously impressed by the fact that NOBLES indicated that he was a doctor and that he ostensibly held two PhD. degrees, as well as a large

collection of cars and property holdings. When it became clear that NOBLES intended to arrange a loan and take half the proceeds, leaving PASS to repay the entire amount, PASS took stock and opted to not provide NOBLES any further financial information. Pass later leaned that the representations by NOBLES that he was a doctor and that he held two (2) PhD. degrees were false and misleading. On information and belief, said representations were intended to be believed by PASS when made.

INTENTIONAL MISREPRESENTATION

(By PASS and THEVAULT against NOBLES)

26. On information and belief, PASS and THEVAULT allege that the following representations were made by NOBLES, that they were false when made, that NOBLES knew or should have known that they were false when made, and that it was the intent of NOBLES that they be believed and relied upon, and further that they were reasonably relied upon by PASS and THEVAULT as described below:

a. That NOBLES is or was a doctor;

b. That NOBLES held a Doctor of Philosophy degree;

c. That NOBLES owned all of the vehicles located in his “private museum”;

d. That NOBLES owned all of the vehicles that were the subject of the sales agreement;

e. That NOBLES had the ability to assist in raising capital through legitimate means;

f. That NOBLES had international financial contacts and partners and that he was a part of an international financial consortium from whom he could secure capital for business expansion;

g. That NOBLES intended to pay the $156,250.00 for the two vehicles he took from THEVAULT; and

h. That NOBLES had the experience and ability to secure financing as

described above

i. That NOBLES intended to raise capital for PASS and THEVAULT of Five Million Dollars ($5,000,000) for the purpose of expansion of the operations of SONIC and THEVAULT.

27. Taken together, these representations created the impression that NOBLES was a legitimate businessman who owned a substantial collection of value, and that he could raise capital for expansion of THEVAULT's business through an international consortium, and that he would and later was pursuing said capital investment, and THEVAULT and PASS are informed and believe and based thereon allege that NOBLES intended that impression to be created, though he knew the representations to be inaccurate when made and that the intended impression referenced above to be created, and knew it to be an inaccurate impression that would be drawn from false representations.

28. In fact, THE VAULT and PASS allege on information and belief that NOBLES was not a doctor, his purported doctoral degrees were obtained from a diploma "mill" that issued him degrees without his having attended any course of study for said degrees, he did not own all of the vehicles located in his "private museum", he did not own all of the vehicles that were the subject of the sales agreement, did not have the ability to assist in raising capital through legitimate means, that he did not have international financial contacts and partners and that he was not a part of an international financial consortium, that he did not have the experience and ability to secure financing as described above, and that he did not intend to pay the $156,250.00 for the two vehicles he took from THEVAULT. PASS and THEVAULT allege that said representations were made by NOBLES with the intent to induce PASS and THEVAULT to continue to market vehicles that were subject to the sales agreement, to forego payment owing for the Ford Thunderbird and Ford F550 and instead offset

the payment owing for said vehicles against future commission to be earned by THEVAULT and NOBLES did not intend to raise capital for PASS and THEVAULT of Five Million Dollars ($5,000,000) for the purpose of expansion of the operations of SONIC and THEVAULT.

29. In reasonable and justifiable reliance on the representations of NOBLES as described above, PASS provided NOBLES sensitive and private personal and corporate financial information pertaining to himself and to THEVAULT, authorized the disclosure of said information to third parties, and incurred expenses associated with obtaining, processing and transmitting said information to NOBLES. Additionally, in reasonable and justifiable reliance on said representations, THEVAULT incurred expenses in transporting vehciles form California to Mississippi, and in inspecting, repairing, cleaning and marketing said vehicles for auction, and further allowed NOBLES to obtain possession and title to the Ford Thunderbird and Ford F550 without having made payment therefore, foregoing collection of the price thereof to a later date.

30. Further, NOBLES, through his representative, presented to PASS a document purporting to be an "Executive Summary" important to the effort to secure investment, in which was integrated an otherwise unrelated document titled "AMENDMENT TO SALES AGREEMENT", and requiring the signature of PASS. Based on the representations by NOBLES that NOBLES had the means and ability to secure capital investment, and in reasonable and justifiable reliance upon said representations, PASS believed that he was to sign the "Executive Summary", and was doing so, but mistakenly electronically executed the AMENDMENT TO SALES AGREEMENT".

31. As a direct and proximate result of the foregoing, THEVAULT was damaged in an amount to be proven at trial in that THEVAULT forestalled collection of sums due

and deferred payment to a later date, incurred expenses as described above in both the marketing of NOBLES's vehicles and in preparing and transmitting financial information to NOBLES, and in the erroneous execution of the amendment to the sales agreement.

32. As a direct and proximate result of the foregoing, PASS was damaged in an amount to be proven at trial in that PASS incurred expenses as described above in preparing and transmitting financial information to NOBLES, and in the erroneous execution of the amendment to the sales agreement.

NEGLIGENT MISREPRESENTATION

(By PASS and THEVAULT against NOBLES)

33. Counterclaimants incorporate and reallege each and every preceding paragraph of this Counterclaim as though set forth in full hereat.

34. THEVAULT and PASS allege in information and believe that foregoing representations by NOBLES without reasonable grounds for believing them to be true.

PRAYER FOR RELIEF

WHEREFORE, Defendants, and each of them, pray as follows:

ON THE COMPLAINT

1. The dismissal of the Complaint with prejudice and without recovery, and a judgment in favor of defendants;

2. That defendants recover costs incurred because of this suit, including reasonable attorneys fees incurred; and

3. Any further relief that this court may deem just and proper.

ON THE COUNTER-CLAIM

1. For damages for intentional and negligent misrepresentation in an amount to be proven at trial;

2. For rescission of any purported amendment to the sales agreement;

3. For costs incurred because of this suit, including reasonable attorneys fees incurred; and

4. Any further relief that this court may deem just and proper.

Dated: July 3, 2024

Schiff & Shelton

/s/ Ralph C. Shelton II
Ralph C. Shelton II, Esq.
Attorneys for Defendants TheVaultMS.com, and Sonicbidder.com and Jerry D. Pass